235 So.2d 680 (1970)
HOMES, INC. and Aetna Casualty & Surety Co.
v.
Mrs. Olivia M. ANDERSON et al.
No. 45693.
Supreme Court of Mississippi.
May 25, 1970.
Bryant & Stennis, Gulfport, Bacon & Smith, Jackson, for appellants.
Louis Hengen, Biloxi, for appellees.
SMITH, Justice.
Homes, Inc., has appealed from a decree of the Chancery Court of the Second Judicial District of Harrison County under the terms of which Homes mandatorily was enjoined to construct "such drainage tile or ditch as may be necessary so that none of the water presently flowing into the lake from defendant's property through its drainage tile will continue flowing into (appellees') lake," and also "such retaining *681 wall or walls as may be necessary to prevent the continuous erosion of the property of Homes, Inc. into said lake." In addition, Homes was ordered to pay various sums to the several appellees by way of damages.
A number of serious questions are presented by the appeal, most of which it will not be necessary to discuss in detail.
A careful review of the record, including the pleadings, topographical maps and the testimony of both the lay witnesses and the several engineers who testified, (these included the county engineer) compels the conclusion that the decree appealed from is manifestly wrong and against the weight of the evidence, insofar as its provisions for a mandatory injunction are concerned.
Appellees are the owners of land which lies immediately east of the land of appellant, Homes, Inc. Appellees were complainants below. The gravamen of their complaint was that Homes, Inc., in preparing its property for use as a subdivision, had cleared away trees, bushes and undergrowth that previously had slowed the flow of surface waters, through a natural drain or watercourse, across the northeast corner of its land and into an artificial pond on appellees' land, that Homes had installed drains to carry this surface water off its land and that this had resulted in silt and dirt draining into the pond. This pond had been formed by constructing an earthen dam across the natural swale, channel or watercourse through which this surface water theretofore normally had flowed.
Only surface water was involved. Prior to the improvement of its land by Homes, this water had flowed into the pond from two sources. One part of it came from lands, not here involved, which lie north of the public road bounding the lands of appellees on the north, and from thence, through culverts under the road, into appellees' pond; and two, some of it came from the north, through culverts under the road, onto appellants' land, where it drained southeasterly, across the northeast corner of appellants' land, through a natural creek, channel or swale, into the pond. After the clearing and improvement of appellants' land had been done, there was no more, no less and no different water than had flowed theretofore into appellees' pond, although the flow of that part of it which crossed appellants' land was no longer impeded by the trees, bushes and undergrowth, and this, together with the installation of drains, had the effect of accelerating its flow. It was established, without dispute, that these drains had the same fall, followed the same natural channel, and delivered this water along the same natural course, as theretofore, and alone which it had been accustomed to flow. This course, channel or drain was the same course, channel or drain which extended onto appellees' land and across which the levee had been constructed to form the pond. It is not clear from the evidence what proportion of this water drained into appellees' pond after crossing appellants' land and what proportion of it did not, but came directly into the pond from the north.
During the course of the clearing and improvement of the Homes' property, rains occurring during the summer months while the work was in progress, washed the loose soil and silt down the natural drain and into the northwest corner of the pond. In September and October an unprecedented amount of rain fell. Particularly heavy rainfalls occurred on September 6 and 7, when 3.42 and 5.01 inches of rain fell respectively. The next month also brought unprecedented rains with 8.42 inches on October 30. These rains caused the pond to overflow, and several loads of dirt were required to repair the dam. The cost of this repair was estimated by appellees at $200. The contractor, who was doing the work for Homes, moved a dragline onto appellees' property for the purpose of removing the soil and silt. However, he was prevented by appellee Anderson, who ordered him off the property at the point of a gun.
*682 Uncontradicted engineering testimony, supported by topographical maps of the area, is that 80 per cent of the silt which comes onto appellees' property comes not from appellants' land but from land belonging to Bailey Homes (dismissed by the court from the litigation upon the ground that complainants' bill had failed to state a cause of action against it) which lies north of the property here in question. It is also undisputed that this result was worsened through the action of Bailey which had increased the volume of water which came down from the north by digging ditches and canals which changed the natural drainage.
The testimony given by appellee Anderson was that "the water came from * * * the north and south and it trickles westward through the underbrush of the property (of the appellant) * * * through a natural drain. * * * [T]here was a natural drain and it came in from the west into the lake before they went in and removed all the trees and all the shrubbery and the underbrush." Another of the appellees testified that the water came into the pond through a marsh which "pretty well held the water and then there was a very small trickle that came through a little creek. * * *" Still another appellee testified that he knew that the water from the north and west of the road flowed to the south across appellants' property into the pond. The testimony of appellees and their witnesses clearly reflects that prior to the improvement of appellants' property there was a natural water drain across appellants' property which carried the water into the pond, describing it variously as a natural drain, trench or little creek. It is beyond question that the course of the water across appellants' property and into the pond was not changed by the improvements.
In Board of Drainage Commissioners of Drainage District No. 10 of Bolivar County v. Board of Drainage Commissioners of Washington County, 130 Miss. 764, 95 So. 75 (1923) it was held that an upper land owner may increase the flow of water in the reasonable exercise of his right of drainage and that to deprive him of this right would be to deprive him of the right to develop his property. This is true although the resulting drainage exceeds the capacity of the natural watercourse.
In Lauck v. Gilbert, 252 Miss. 371, 173 So.2d 626 (1965) the Court quoted with approval a statement appearing in 93 C.J.S. Waters § 114a (4) (1956).
The upper owner of land has the right, without interference, to have the flow of surface water follow along a well-defined watercourse from his land. Where surface water has been accustomed to gather and flow along a well-defined channel, which by frequent running it has worn into the soil, it has been held that it may not be obstructed to the injury of the dominant proprietor, but the upper owner cannot prevent interference with the drainage of surface water unless the servitude be clearly and permanently impressed on the property. Where a ditch is constructed across the lands of two adjacent proprietors in accordance with the natural flow of water, neither can disregard the rights of the other by changing the course of such water.
This is not a case of gathering into an artificial channel rain or surface water which had previously dispersed over the land and by that means discharging it in an artificial manner upon the lands of another.
The evidence in the record compels the conclusion that the clearing of the land and the installation of the drain in no way changed the course of the natural channel into which such surface waters previously had flowed and had been carried into the pond. It cannot be disputed that these things caused appellants' land to be drained more efficiently and thus the flow was accelerated. Moreover, it is clear from *683 the record that such damage as appellees sustained came about upon the occasion of an unprecedented rainfall, for which the drain or spillway in appellees' earthen dam or levee proved to be inadequate.
Damages of $500 each were awarded to appellees Anderson, Acre and Burleson for loss of fishing rights and for silt, soil and debris flowing into the lake. Appellee Anderson was awarded additional damages of $4,000.
In view of the fact that Appellee Anderson physically prevented the appellant from removing the silt and debris and repairing all damages, together with the fact that the damages were primarily caused by unprecedented rains and not by an unreasonable use of its property by the appellant as the upper and dominant landowner, we conclude that the appellees were not entitled to any damages. We are reinforced in this view by the fact that the appellant had a clear right to mitigate and minimize the damages but was denied this right by the appellees themselves. They have asked an equity court for relief and yet they were not willing to do equity.
As pointed out above, the court granted a mandatory injunction requiring appellant to construct drains and ditches capable of carrying off the water from its land over an artificial route along which water had never previously drained and, in addition, to construct walls which would prevent this water from following its natural course onto lands of the appellee and into the pond. It is with reluctance that we must disagree with the chancellor.
In Mississippi State Highway Commission v. Spencer, 233 Miss. 155, 176, 101 So.2d 499, 506 (1958), this Court said:
A mandatory injunction is an extraordinary remedial process. Courts are more reluctant to grant a mandatory injunction than a prohibitory one. 43 C.J.S. Injunctions § 5. Although equity has jurisdiction to issue them, they should be confined to cases where it is the only remedy which will be effectual. 43 C.J.S. Injunctions § 5, states: "Even if the right is clear, it does not follow that a mandatory injunction must be granted, and such injunctions will be issued only in cases of extreme necessity, where the right invaded is material and substantial, and where adequate redress at law is not afforded. Mandatory injunctions will never be granted unless extreme or very serious damage at least will ensue from withholding that relief; nor will they be issued in doubtful cases * * *."
In Thomas v. Mississippi Power and Light Company, 170 Miss. 811, 152 So. 269 (1934) this Court held a mandatory injunction should never issue unless the right is clearly and certainly shown and unless there could be no reasonable doubt.
To sustain this injunction would deprive appellant of the right reasonably to improve and use its property for a legitimate purpose and would impose an oppressive expense and hardship not justified by any circumstances in evidence.
Moreover, adequate provision for carrying off the water coming into the pond from all sources, even in the case of excessive rainfall, obviously requires no more than the installation of a drain or spillway of a somewhat larger capacity than the one in place when the levee was damaged. To require the owner of higher lands to retain upon such lands all of the water coming onto them and to allow none of it to escape and flow onto the lands of his neighbor onto which they always had naturally flowed theretofore is to require a practical impossibility. Moreover, such a course would impose an intolerable burden upon the owners of the upper lands in every watershed.
Finally, the court dismissed without prejudice the claims of complainants, Don H. Allen, Glen D'Orville and Mrs. Seymour Cates. As to these claims issue had been duly joined, and complainants had *684 rested, when the claims were dismissed because of the absence of proof to sustain them. Under the circumstances, the dismissals should have been with prejudice. The decree appealed from with respect to these claims is modified to provide that the claims of said named persons shall stand finally dismissed with prejudice to their further rights with respect to the subject matter thereof.
Reversed and decree here for appellants.
ETHRIDGE, C.J., and RODGERS, PATTERSON and ROBERTSON, JJ., concur.