443 So.2d 834 (1983)
C. Leo HALL, Mary Hall and Randy Lee Hall, Appellants,
v.
Dr. Eugene G. WOOD, Jr., et al., Appellees.
No. 54546.
Supreme Court of Mississippi.
December 7, 1983.
*836 Russel D. Moore, III, Moore, Royals & Hartung, Jackson, for appellants.
David K. McGowan, Jackson, for appellees.
Before PATTERSON, C.J., and DAN M. LEE and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This is a diffused surface waters case. In 1979 Leo Hall and members of his family purchased and cleared a 20 acre tract of land in southwest Jackson. Almost immediately diffused surface waters flowing across the skinned land began depositing excessive amounts of silt, sediment and pollution into nearby Lake Catherine. Owners of property abutting Lake Catherine have brought suit and the Chancery Court has enjoined the Halls, prohibitorily and manditorily, to cease and correct their pollution and destruction of Lake Catherine.
The Halls have appealed charging primarily that the injunction denies them the use of their property for legitimate purposes. In the context of the facts of this case and the damage caused to Lake Catherine, we hold that the stripping of the Hall lands without taking adequate measures to prevent erosion was not a legitimate use of the Halls' property. Accordingly, with only a modification in form to be explained below, we affirm.

II.

A.
Plaintiffs below and Appellees here are 27 property owners whose lots abut Lake Catherine in southwest Jackson. They are sometimes referred to below as "the Lake Catherine Plaintiffs".
The Defendants below and Appellants here are C. Leo Hall, his wife, Mary Hall, and their son, Randy Lee Hall, each of whom at various times have owned interests in a 20 acre tract northwest of Lake Catherine. At all times C. Leo Hall (hereinafter "Hall") was the dominant actor on behalf of his family's interests in this land.
On January 27, 1979, the Halls acquired this 20 acre tract. At the time it was heavily wooded. Prior to that time, access to and rights in Lake Catherine were a valuable appurtenance to the Plaintiffs' *837 residential properties. Lake Catherine has been a source of recreational and aesthetic enjoyment.
The Halls' 20 acre tract is zoned commercial. Hall acquired it for commercial development purposes. In the summer of 1979 Hall employed land clearers to remove all trees, vegetation and undergrowth. By August of 1979 the land had been completely stripped. The theretofore existing contours of the land were not altered, and no erosion prevention measures were taken at that time.
Hall had been engaged in negotiations with a major retail department store firm. He contemplated a sale of the property to this firm and others for development as a shopping center. Insofar as the record reflects, the tight money economy prevailing in 1979 resulted in the parties with whom Hall was negotiating abandoning their interest in the 20 acre tract in question. Hall was stuck with the property and remains so.
Once the land was stripped the forces of nature went to work, impervious to Hall's economic woes. Diffused surface water sped across the land toward the upper end of Lake Catherine. Silt, sediment and other pollutants began to be deposited in the lake. In the spring of 1980 Hall made an ineffectual attempt to fertilize and seed the property. The erosion continued apace.
Over the last three years, approximately 80 to 100 tons of silt and sediment have been deposited in the upper end of Lake Catherine per acre per year. A mud bar has been created in the northern end of the lake destroying spawning habitat. Suffice it to say that the ecology of the waters of Lake Catherine has been substantially adversely affected. The undisputed culprit is the eastern 12 acres or so of the Hall land, skinned in 1979 but now heavily rutted.

B.
On April 30, 1982, the Lake Catherine Plaintiffs commenced this civil action. In a nutshell they charged that the Halls had been negligent in the use of their adjoining property to the northwest and that this negligence had proximately caused substantial damage to Lake Catherine and their respective property rights therein. The Lake Catherine Plaintiffs further alleged that the damage was continuing. They demanded prohibitory injunctive relief restraining the Halls from any further deposits of silt or sediment into Lake Catherine as well as mandatory injunctive relief that the Halls restore Lake Catherine as nearly as practicable to its former condition. Plaintiffs further demanded monetary damages as well as a lien on the Halls' property to secure their performance of the requested injunctive relief. The Halls denied these allegations and demands for relief.
The matter was tried on its merits on June 21, 1982, in the Chancery Court, First Judicial District, Hinds County, Mississippi.
On August 2, 1982, the Chancery Court released its opinion in substance holding for the Lake Catherine Plaintiffs. The Chancery Court recognized the rule
that any landowner has a right to develop his property and has the right to increase the flow of water [but that] he does not have the right to cause silt to be washed into the lower landowners.
Under that rule, the Halls were found liable.
The trial court then made clear that it
has no intention of trying to spell out exactly what should be done to stop the erosion.
The court's opinion concluded:
The Defendant, Leo Hall, should be required to do whatever is necessary to stop the erosion from land owned by him and his son into Lake Catherine and to proceed forthwith with whatever is necessary. Further, the Defendant, Leo Hall, is directed to remove the silt from Lake Catherine which has been previously eroded into Lake Catherine from his property.
The Plaintiffs have not specifically proved any damage to them but collectively they will be given a lien against the property of the Defendants, Leo Hall *838 and Randy Hall, to guarantee the work. James Winstead will be requested to work with the Defendant, Leo Hall, in connection with stopping the erosion into Lake Catherine and to remove the silt from Lake Catherine.
A final decree was entered September 1, 1982, carrying into effect the forgoing opinion. From that decree, the Halls have perfected this appeal.

III.

A.
We cherish the notion that a person's real property is his to do with as he sees fit, see Andrews v. Lake Serene Property Owners Association, 434 So.2d 1328, 1331, 1333 (Miss. 1983), although the complexities and interdependence of today's world have produced not insignificant limitations. Ordinarily the landowner has the right reasonably to improve and use his property for any legitimate purpose. Homes, Inc. v. Anderson, 235 So.2d 680, 683 (Miss. 1970).
For these rights to be meaningful, each property owner's use and enjoyment of his property must be shielded from unreasonable interference by others  these "others" ranging from the faceless sovereign to one's next door neighbor. By the same token, how one person uses his property necessarily affects others. These effects may be positive or detrimental. How my neighbor uses his land may enhance or destroy my land's value in use or in exchange, and sometimes both.
Given these realities, our reasoned and intuitive sense of justice demands that each property owner be assured an equal right to the most extensive freedom of use of his property and freedom from interference by others, compatible with an equal freedom of use/freedom from interference on the part of all of one's neighbors. Cf. Rawls, A Theory of Justice, 60, 250 (1971). This broad principle of justice as fairness among property owners is the common denominator of the rules of law which have evolved in our cases as will be articulated below.
Our concern in this case is water. Water may be a blessing or a curse to the landowner. Waters provide aesthetic enjoyment. They nourish life. Waters also flood. They erode. Waters impede use and development. They carry pollution, wholly indifferent to its chemical properties or destructive potential.
Waters are thrust upon our lands the enjoyment of which our law protects by a variety of natural processes. The state may make laws and thus create rights guarding the legitimate interests of property owners. Pursuant to the laws of the state, disputes between property owners are heard and adjusted. Waters obey only the laws of physics, principal of which are the laws of gravity. See Lauck v. Gilbert, 252 Miss. 371, 394, 173 So.2d 626, 637 (1965).
In their obedience to physical laws, waters have generated disputes in a variety of factual contexts. Our law has generated general rules which we find applicable without regard to specific factual contexts. The equal maximum right to use/equal maximum freedom from interference principle stated above certainly applies in every context. Historically most litigation concerned natural watercourse disputes. Most of our case law arises in this context. Recently we have heard more and more diffused surface water cases. See Homes, Inc. v. Anderson, 235 So.2d 680 (Miss. 1970); see also Comment, Diffused Surface Waters in Mississippi, 46 Miss.L.J. 118 (1975). As recently as 1978 this Court intimated that there might be a difference in principle between the two types of cases. See Warrior, Inc. v. Easterly, 360 So.2d 700, 702 (Miss. 1978). Upon reflection, that difference escapes us. By virtue of the general considerations discussed above, the rules and principles found in our case law have force in all waters cases bearing similarities of operative fact.
We emphasize an elementary proposition. Each landowner takes his lands  and their waters  as he finds them, burdens and benefits alike. Where the flow of waters has been rendered by the operation *839 of the laws of physics upon the natural contours of the land, a lower landowner has no rights against his upper neighbor for damages thus caused. Certainly upper landowners may use well established watercourses through lower lands to drain upper properties. Lauck v. Gilbert, 252 Miss. 371, 395, 173 So.2d 626, 637 (1965); Shattles v. Field, Brackett & Pitts, 261 So.2d 795, 797 (Miss. 1972); Ferris v. Wellborn, 64 Miss. 29, 8 So. 165 (1886). On the other hand, an upper landowner may not unreasonably alter natural drainage patterns to the detriment of his lower neighbor.

B.
By way of implementation of the equal maximum freedom of use/equal maximum freedom from interference principle stated above, the law of this state has repeatedly recognized and imposed upon upper landowners substantial duties and obligations toward lower landowners. See, e.g., Steed v. Kimbrough, 197 Miss. 430, 436, 19 So.2d 925, 926 (1944); Newton Coca Cola Bottling Co. v. Murphrey, 212 Miss. 823, 55 So.2d 485 (1951); Shattles v. Field, Brackett & Pitts, Inc., 261 So.2d 795, 797-798 (Miss. 1972); and Payne v. Touchstone, 372 So.2d 1277, 1279-1280 (Miss. 1979). In this context, our law is a two way street, vesting comparable rights in upper landowners. An upper landowner may without fear put his lands to reasonable uses even though as a proximate result thereof waters harm lower landowners, provided the harm is not unreasonable or unnecessarily severe. See, e.g., Board of Drainage Commissioners of Drainage District No. 10 of Bolivar County v. Board of Drainage Commissioners of Washington County, 130 Miss. 764, 95 So. 75 (1923); American Sand and Gravel Company v. Rushing, 183 Miss. 496, 502, 184 So. 60 (1938); Lauck v. Gilbert, 252 Miss. 371, 173 So.2d 626 (1965); Homes, Inc. v. Anderson, 235 So.2d 680, 682 (Miss. 1970).
The owner of unimproved upper lands may allow diffused surface waters to drain from his lands unimpeded in their natural state even though lower landowners are affected. Payne v. Touchstone, 372 So.2d 1277, 1279 (Miss. 1979). To require an upper landowner to retain all waters coming onto his property from all sources, especially rainfall would (a) be to require an impossibility and (b) impose an intolerable burden on the owners of upper lands in every water shed. Homes, Inc. v. Anderson, 235 So.2d 680, 683 (Miss. 1970); Payne v. Touchstone, 372 So.2d 1277, 1280 (Miss. 1979). An upper landowner may increase the flow of water via drainage incident to the reasonable development of his property even though it does some damage to the lower landowner. Homes, Inc. v. Anderson, 235 So.2d 680, 682-683 (Miss. 1970); Shattles v. Field, Bracket & Pitts, Inc., 261 So.2d 795, 797 (Miss. 1972); Payne v. Touchstone, 372 So.2d 1277, 1280 (Miss. 1979). Water by its nature confers burdens as well as benefits. These burdens our law requires be shared equitably.
From the vantage point of the owner of lower lands, the law is complementary. In diverting waters from his lands, any landowner must use reasonable care to prevent unnecessary injury to adjoining landowners. Holman v. Richardson, 115 Miss. 169, 179, 76 So. 136, 137 (1917); Payne v. Touchstone, 372 So.2d 1277, 1279 (Miss. 1979). The owner of upper lands does not have the right to collect and discharge waters onto the lower landowner with impunity even though in some instances in no greater overall quantity than flowed from his property in its natural state. Steed v. Kimbrough, 197 Miss. 430, 436, 19 So.2d 925, 926 (1944); Warrior, Inc. v. Easterly, 360 So.2d 700, 702-703 (Miss. 1978); Payne v. Touchstone, 372 So.2d 1277, 1279 (Miss. 1979). Numerous cases have held that upper landowners may not by artificial means discharge waters in greater quantities to the detriment of lower landowners. Steed v. Kimbrough, 197 Miss. 430, 436, 19 So.2d 925, 926 (Miss. 1944); Newton Coca Cola Bottling Co. v. Murphrey, 212 Miss. 823, 55 So.2d 485 (1951); Shattles v. Field, Bracket & Pitts, Inc., 261 So.2d 795, 797 (Miss. 1972); Warrior, *840 Inc. v. Easterly, 360 So.2d 700, 702-703 (Miss. 1978).
Getting closer to the facts of the case at bar, this Court has held an upper landowner liable where he graded his lot and thereby caused a concentrated discharge of waters onto his neighbor's land. Newton Coca Cola Bottling Co. v. Murphrey, 212 Miss. 823, 55 So.2d 485, 489 (1951). In such cases, nothing turns on whether the discharge is generated via grading (changing the contours of the land) or mere clearing (where the contours remained unchanged).
Where two methods of disposing of excess waters are available to an upper landowner, one of which will damage the lower lands of his neighbors and the other of which will not, the upper landowner, absent prohibitive expense, must use the latter alternative. Holman v. Richardson, 115 Miss. 169, 179, 76 So. 136, 137 (1917); Payne v. Touchstone, 372 So.2d 1277, 1279 (Miss. 1979).
The careful reader will note that the principles stated are not wholly consistent one with the other. Neither logical nor peaceful coexistence is possible unless one emphasizes before each such principles the qualifier "generally speaking" or "in the absense of equitable considerations to the contrary". The reciprocal equal maximum freedom of use/equal maximum freedom from interference principle, considered against the backdrop of the natural conditions of the land and water's obedience to the laws of physics, are always our touchstone.[1]

C.
Applying these principles, we hold that upper landowners such as Hall are entitled to make reasonable use of their land. Where there is a reasonable likelihood of damage to the property of lower landowners, however, upper landowners are required to do whatever is reasonable to minimize the damage. The fact that some damage nevertheless occurs to the lower landowners does not render the upper landowner liable. On the other hand, where the upper landowner has done nothing in an effort to ameliorate the adverse effect on lower landowners and where the damage is in fact substantial, and further where the development activities of the upper landowner are a major proximate cause of that damage, the lower landowners are entitled to damages and/or injunctive relief as may be appropriate.
Under the facts of this case, we do not hesitate to uphold the conclusions of the chancellor on the question of liability. The Plaintiffs in this case have important and viable property rights in Lake Catherine. That lake lies to the southeast and generally below Leo Hall's 20 acres. Hall stripped his land, albeit with legitimate development plans in mind. He reasonably should have known his actions would result in erosion which in turn would result in substantial silting, sedimentation and general pollution of Lake Catherine. When belatedly Hall attempted corrective actions, he was ineffectual. Without doubt there has been major damage to the ecology of the water of Lake Catherine, and without doubt, the culprit is Hall's skinned land. On the liability phase of this case, we affirm.

IV.

A.
With one exception to be explained below, the relief portion of the chancellor's decree will likewise be affirmed.
To begin with, the proof of damage to individual landowners was sufficiently diffused so that the chancellor was wholly *841 correct in denying actual damages. Besides, it is clear from this record that actual damages will do the Lake Catherine Plaintiffs little good. They want their lake restored. As soon as is practicable, they want to be able to enjoy the waters their properties adjoin and include.
We emphasize that an injunction is an equitable remedy. It must be tailored to meet the exigencies of the situation. It must be clear in that the party enjoined is entitled to know what he is expected to do or to refrain from doing. It must be practical in that it must be susceptible of compliance without undue hardship and reasonably likely to achieve the desired end.
In the Final Decree of September 1, 1982, Hall was mandatorily enjoined:
(a) to do whatever is necessary to stop the erosion from the subject property into Lake Catherine, and (b) to do whatever is necessary to remove from Lake Catherine all silt which has eroded into Lake Catherine from the subject property.
The essence of the injunction is mandatory, although the "stop any further erosion" part has prohibitory trappings.
We reaffirm and reemphasize our longstanding rules that a court of equity should grant a mandatory junction with extreme caution. Homes, Inc. v. Anderson, 235 So.2d 680, 683 (Miss. 1970). A mandatory injunction should be ordered where such is "the only effective remedy". Warrior, Inc. v. Easterly, 360 So.2d 700, 704 (Miss. 1978); Homes, Inc. v. Anderson, 235 So.2d 680, 683 (Miss. 1970).
Mandatory injunctions should be granted only where that which they demand is reasonably practicable. A mandatory injunction requiring "a practical impossibility" should never issue. Homes, Inc. v. Anderson, 235 So.2d 680, 683 (Miss. 1970). The expense and hardship to the party enjoined should also be considered. That these may be substantial counsels caution and restraint.
The uncontradicted evidence in the record reflects that remedial measures are practicable.
Consider first so much of the injunction as enjoins Hall to act to prevent further unreasonable pollution of Lake Catherine. The evidence makes clear that heavy fertilization and seeding coupled with terracing would substantially slow down the flow of water off of Hall's property. A debris basin or sediment control structure constructed at the lower end of the property would keep much sediment out of the lake. In short, corrective measures are feasible.
The Lake Catherine Plaintiffs established that cleanup was also practicable. The water level will have to be lowered before the silt may be removed. This cost of the cleanup operation was estimated at $50,000. Hall offered no evidence suggesting impracticability of cleanup.
Applying to the facts of a given case the important considerations counseling restraint when mandatory injunctive relief is sought inevitably requires judgment calls. Suffice it to say here that the judgment that mandatory injunctive relief was practicable and was the only practicable remedy was well within the evidence and the chancellor's discretion. Under these circumstances, we decline to disturb the chancellor's decision.

B.
On the matter of the content of the specific injunction issued, we applaud the wisdom of the chancellor's recognition that no court under such circumstances should "try ... to spell out exactly what should be done to stop the erosion". We emphasize that his failure in this regard in no way runs afoul of our long established rule that mandatory injunctions must be clear and explicit on their face so that the party enjoined will be distinctly informed as to what he is enjoined from doing or what he is commanded to do. See, e.g., Illinois Central Railroad Co. v. George, 241 Miss. 233, 238, 130 So.2d 260, 261 (Miss. 1961); Lauck v. Gilbert, 252 Miss. 371, 393, 173 So.2d 626, 636-637 (Miss. 1965). Nor did *842 the chancellor depart from our current rule found in Rule 65(d)(2), Miss.R.Civ.P., which in pertinent part provides:
Each order granting an injunction ... shall be specific in terms; [and] shall describe in reasonable detail and not by reference to the complaint or other document the act or acts sought to be restrained; . .. .
When ordering the achievement of ends necessarily reached only through the employment of scientific or engineering techniques, courts of equity should be particularly cautious. An overly precise specification of means will generally be beyond judicial competence in fact or in law. What should and ought be done is the very clear specification of the end to be achieved. The party enjoined should then be directed to proceed with reasonable dispatch.
The court should be as clear as it reasonably can be in specifying the end which the party enjoined must achieve. On the other hand, it ordinarily will be appropriate to leave the party enjoined maximum flexibility with regard to the means of achieving the end.
The Plaintiffs in whose favor the injunction is issued have an interest in seeing the work proceed with dispatch. Ordinarily, they have no legitimate interest in the methodology employed. They are entitled to a judicial specification of means only if the means selected by the party enjoined does not substantially achieve the desired end within a reasonable period of time.

C.
The general form of the chancellor's injunction is correct, within the evidence, and will not be disturbed. In one respect, however, the injunction must here be modified.
The final decree provides that Hall shall be deemed to have complied with the injunction
when Jack Winstead shall have certified to this Court that such work have been completed to his satisfaction.
Winstead was the Hinds County ASC Agent who testified as an expert witness at trial. There is nothing wrong with the court designating an independent expert to serve as an overseer or advisor regarding compliance with work such as that Hall has been enjoined to undertake. The chancellor, however, did not have the authority to delegate to Mr. Winstead what is essentially a judicial responsibility, i.e., certification of compliance with the injunction. Lauck v. Gilbert, 252 Miss. 371, 391-392, 399-400, 173 So.2d 626, 636, 640 (1965).
Ironically, the decree and particularly the part we here hold to be error, was drafted by the attorneys, not the chancellor. While it is no doubt of great assistance to the trial judges of this state to have attorneys draft, and consent to the form of, final judgments and decrees, the trial judge himself must independently evaluate and consider the provisions of any such decree and make such corrections as may be appropriate.

D.
Finally Hall challenges that portion of the chancellor's decree as impresses his 20 acre tract with a lien to secure his performance of the injunctive provisions of the decree. Hall's argument, in essence, is that the chancellor had no such lien creating power because there is no reported case in which any such power has been exercised. Hall recognizes that the Chancery Court, where it grants a money judgment, has the power to impress a lien to secure payment of that judgment, as in alimony and child support matters. He urges, on the other hand, that the chancellor has no power to impress a lien to secure compliance with a mandatory and prohibitory injunction.
The remedial powers of our chancellors are sufficient to vindicate the claims and interests of all litigants. Those powers are as broad as equity and justice require. Those powers have always been marked by flexibility and expansiveness so that appropriate remedies may be decreed to satisfy the needs of the particular case. The chancellor's *843 remedial powers are marked by plasticity. Equity jurisdiction permits innovation that justice may be done. See Higginbottom v. Short, 25 Miss. 160 (1852). That there is no precedent for the precise relief sought is of no consequence.
Courts of equity have all remedial powers necessary to the particular case, except those that are expressly forbidden by law. Accordingly, we look to our law to see if impression of a lien to enforce compliance with an injunction is a power forbidden to the chancellor by our law. We find no statutory or decisional impediment to such power, nor is there apparent in juridical logic any rationale under which this power ought be denied our chancellors.
In holding that the chancellor had the authority to impress a lien, we have taken only the first step. The exercise of such remedial authorities as are committed to our chancellors is ultimately a matter of sound discretion. If the authority exists, we will interfere with the exercise of the authority only where it is demonstrated that the discretion has clearly been abused. No such showing of abuse has been made. On this assignment of error, we affirm.
AFFIRMED AS MODIFIED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
NOTES
[1] The several states of this Union have adopted varying approaches to adjustments of the rights of the parties in waters cases. Commentators have classified these approaches under three labels: (a) "the natural-flow or civil-law rule"; (b) "the common-enemy rule"; and (c) "the reasonable-use rule". See Comment, Diffused Surface Waters in Mississippi, 46 Miss.L.J. 118, 122-129 (1975). The label which most nearly fits and most accurately describes the principles reviewed and applied here is "reasonable use".